**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| CASSIDIAN COMMUNICATIONS, INC. | § | |
| Plaintiff, | § | |
| v. | § | Civil Action No. 2:12-cv-00162-JRG |
| MICRODATA GIS, INC. MICRODATA, LLC, and TELECOMMUNICATION SYSTEM, INC. | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

On December 20, 2013, after a five day jury trial, a jury in this patent infringement case reached a verdict. (*See* Dkt. No. 155.) The jury found that (1) Plaintiff Cassidian Communications, Inc. ("Cassidian") had not proved by a preponderance of the evidence that Defendants microDATA GIS, Inc. and microDATA, LLC (collectively, "microDATA") directly infringed United States Patent No. 6,744,858 (the "'858 Patent"); (2) Cassidian had not proved by a preponderance of the evidence that microDATA and a second Defendant TeleCommunication Systems, Inc. ("TCS") (collectively, "Defendants") indirectly infringed the '858 Patent; and (3) Defendants had proved by clear and convincing evidence that each of the asserted claims of the '858 Patent was invalid. (*See id.*) Cassidian now seeks judgment as a matter of law to overturn the jury's finding of invalidity, or in the alternative, seeks a new trial as to validity. Cassidian also seeks a new trial on the issue of infringement. (*See* Dkt. No. 184.) Having reviewed the parties' written submissions, and for the reasons stated below, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** Cassidian's motion for judgment as a matter of law as to invalidity, and

**DENIES** Cassidian's motion for a new trial on the issue of validity or infringement.

## I.   BACKGROUND

Plaintiff Cassidian Communications, Inc. ("Cassidian") filed the above-styled action against Defendants on March 26, 2012, alleging that Defendants infringed claims 1, 3-8 and 12-14 of the U.S. Patent No. 6,744,858 (the '858 Patent).   Specifically, Plaintiff identifies microDATA's X-Solution products and TCS's Gemini system as the accused infringing products. The '858 Patent was filed provisionally on January 26, 2001 and issued on June 1, 2004.   It then went through an *Ex Parte* Reexamination, and the Reexamination Certificate was issued on December 2, 2008.   Among the asserted claims, claims 1 and 3 are independent claims and the remaining claims are dependent claims.

At the jury trial and after the close of the evidence, the Court granted Plaintiff Cassidian's Rule 50(a) motion for judgment as a matter of law that: (1) the asserted claims of the '858 Patents are not indefinite; (2) the asserted claims are not invalid for being obvious; and (3) no asserted dependent claims are invalid for being anticipated.   (Trial Tr. Dec. 19, 2013 PM at 96:18-22; 96:23-97:7; 99:15-18.)   The Court also granted Defendants' motion for judgment as a matter of law that there is no direct infringement of dependent claims 4-5 and 12-14, which depend on independent claim 3.   (*Id.* at 111:15-22.)

## II.   LEGAL STANDARD

A motion for judgment as a matter of law should be granted if there is no legally sufficient evidentiary basis for a reasonable jury to find for a party.   *See* Fed. R. Civ. P. 50.   Upon a party's renewed motion for judgment as a matter of law following a jury verdict, the Court asks whether "the state of proof is such that reasonable and impartial minds could reach the conclusion the jury

expressed in its verdict." Fed. R. Civ. P. 50(b); *Am. Home Assur. Co. v. United Space Alliance*, 378 F.3d 482, 487 (5th Cir. 2004). A jury verdict must stand unless there is lack of substantial evidence to support the jury's factual findings, or the legal conclusions implied from the jury's verdict cannot, in law, be supported by those findings. *Id.* "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Threlkeld v. Total Petroleum, Inc.*, 211 F.3d 887, 891 (5th Cir. 2000). "[A] mere scintilla of evidence is insufficient to present a question for the jury." *Id.* In evaluating a motion for judgment as a matter of law, a court must "draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that [the court] might regard as more reasonable." *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 451 (5th Cir. 2013) (citation omitted).

A motion for a new trial may be granted for "any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1). "A new trial may be granted…if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985). A verdict can be against the "great weight of the evidence", and thus justify a new trial, even if there is substantial evidence to support it. *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982). "The trial court in passing on a motion for a new trial need not take the view of the evidence most favorable to the verdict winner, but may weigh the evidence." *Id.*; *Laxton v. Gap Inc.*, 333 F.3d 572, 586 (5th Cir. 2003) (citing *Shows*, 671 F.2d at 930).

## III. ANALYSIS

### A. The Jury's Finding of Invalidity

At the jury trial, Defendants presented three separate theories challenging the validity of the asserted claims of the '858 Patent: (1) improper inventorship; (2) anticipation; and (3) lack of written description or enablement. The jury returned a general verdict finding all the asserted claims invalid. (*See* Dkt. No. 155 at 4.) Cassidian now argues that there exists no legally sufficient evidence by which a reasonable jury could have found any claim of the '858 Patent invalid. In essence, Cassidian seeks judgment as a matter of law that Defendants have failed to prove the invalidity of the '858 Patent under any of the three theories presented at trial. The Court will address each of Defendants' invalidity theories in turn.

#### a. Inventorship

At the jury trial, Defendants challenged the validity of the '858 Patent for improper inventorship on the basis that Mr. William R. Whitehurst, whose name was not listed in the '858 Patent, is an inventor of the claimed technology. Cassidian argues that, based on the evidence presented at trial, no reasonable jury could have found that the '858 Patent is invalid on inventorship grounds.

The inventors named on an issued patent are presumed to be correct, so a party challenging the validity of a patent based on nonjoinder of inventors must prove such with facts supported by clear and convincing evidence. *Univ. of Colorado Found., Inc. v. Am. Cyanamid Co.*, 342 F.3d 1298, 1308 (Fed. Cir. 2003). "Conception is the touchstone to determining inventorship." *Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ. v. Hedrick*, 573 F.3d 1290, 1297 (Fed. Cir. 2009). To meet the clear and convincing evidentiary burden, the alleged co-inventors must prove their contribution to the conception with "more than their own testimony concerning the relevant

facts." *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1327 (Fed. Cir. 2004). That is, the alleged inventor must prove his conception by corroborating evidence. *Hedrick*, 573 F.3d at 1297. Whether the co-inventor's testimony has been sufficiently corroborated is evaluated under a "rule of reason analysis," which requires that an "evaluation of all pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached." *Linear Tech.*, 379 F.3d at 1327. Corroborating evidence may take many forms. *Id.* Reliable evidence of corroboration preferably comes in the form of "records made contemporaneously with the inventive process." *Id.* Circumstantial evidence of an independent nature and oral testimony from someone other than the alleged inventor may also corroborate. *Id.*

At trial, Mr. Whitehurst did not appear live, or by video deposition. Defendants read Mr. Whitehurst's deposition testimony from another case into the record. (Trial Tr. Dec. 18, 2013 PM at 72:5-9.) In his deposition, Mr. Whitehurst testified that he came up with the idea of using a voice-over-internet-protocol ("VoIP") based system, instead of wired connections, to support Public Safety Answering Points ("PSAP"). (Trial Tr. Dec. 19, 2013 AM at 13:5-11; 38:18-25 (Whitehurst).) Mr. Whitehurst further testified that the conception took place either in 1999 or in early 2000, when he was an employee of Tel Control Inc. ("TCI") – the original owner of the '858 Patent. (*Id.* at 14:16-20.). Mr. Whitehurst joined TCI as an employee in 1997 and left on July 17, 2000, about six months prior to the filing of the '858 provisional patent application. (Trial Tr. Dec. 18, 2013 PM at 75:22-25 (Whitehurst); Trial Tr. Dec. 19, 2013 AM at 26:6-8 (Whitehurst); PX003.) According to Mr. Whitehurst, Mr. Terry Ryan and Mr. Randel Henry, the two co-inventors of the '858 Patent and also TCI employees, implemented the system that embodied his idea. (Trial Tr. Dec. 19, 2013 AM at 28:2-7 (Whitehurst).)

Cassidian first challenges Mr. Whitehurst's alleged inventorship on the basis that his testimony was not sufficiently corroborated. To corroborate Mr. Whitehurst's testimony, Defendants presented to the jury the title page of a white paper which had been attached to the provisional application of the '858 Patent. (PX003 at CSDN_A-00000926; Trial Tr. Dec. 18, 2013 PM at 79:13-80:10 (Whitehurst).) The white paper was entitled "Carrier-Class VoIP/PSAP," and was authored by Mr. Whitehurst on June 8, 2000. (PX003 at CSDN_A-00000926.) Cassidian contends that the white paper does not constitute corroborating evidence, because it was not made "contemporaneously with the inventive process." *See Linear Tech.*, 379 F.3d at 1327. Mr. Whitehurst allegedly came up with the conception of the claimed technology either in 1999 or in early 2000, and the white paper was dated June 8, 2000. However, contemporaneous disclosure, though a preferred form of corroborating evidence, is not the only form. *See id.* Here, a white paper authored by Mr. Whitehurst, the alleged co-inventor, which was attached as a supporting document to the provisional application of the '858 Patent, is clearly pertinent to determining the credibility of Mr. Whitehurst's story, even though the document slightly post-dates the conception date. A reasonable jury could have considered the white paper as corroborating evidence to Mr. Whitehurst's alleged contribution to the conception of the '858 Patent.

To further corroborate Mr. Whitehurst's testimony, Defendants asked him to identify an undated presentation, also attached to the '858 Patent's provisional application, which was entitled "Computer Telephony Integration - 911 VoIP IPSAP by Tel Control Inc." (the "CTI Presentation").[1] (*See* PX003 at CSDN_A-00000940; Trial Tr. Dec. 18, 2013 PM at 81:5-8

[1] Though the CTI Presentation is undated, the parties seem to agree that it likely was created in early 2000, sometime before Mr. Whitehurst left TCI in July 2000. (*See* Dkt. No. 184 at 15.)

(Whitehurst).) Mr. Whitehurst, along with Craig Dollar and Terry Ryan, were identified as presenters. (*See* PX003 at CSDN_A-00000941.) Mr. Whitehurst acknowledged that Mr. Terry Ryan, one of the co-inventors, and Mr. Craig Dollar, then his supervisor, both contributed partly to the technical aspect of the presentation. (Trial Tr. Dec. 18, 2013 PM at 81:25-83:15 (Whitehurst).) Other than that, however, Mr. Whitehurst stated that it was he who contributed the rest of the presentation, including creating a diagram for IPSAP configuration which is similar to one of the figures eventually embodied in the '858 Patent.[2] (*Id.* at 86:2-21; 91:1-5; PX003 at CSDN_A-00000962.) Cassidian argues that Mr. Whitehurst's testimony regarding the CTI Presentation is contradictory, in that he testified that the IPSAP product described in the presentation already existed at the time of his departure from TCI, while he later testified that Mr. Ryan and Mr. Henry did not start building the IPSAP system until after his departure. (*See* Trial Tr. Dec. 19, 2013 AM at 26:6-13, 28:8-20 (Whitehurst).) The Court notes first that it is not entirely clear whether Mr. Whitehurst intended to say that the final IPSAP product had been completed at the time of his departure. (*See id.* at 26:11-13 ("QUESTION: Okay. And at that time, did *whatever was contemplated as the IPSAP product* exists as well? ANSWER; Yes. Yes.) (emphasis added).) Mr. Whitehurst testified that, prior to his departure, he himself had set up some test for "testing the concept" that eventually became the IPSAP product. (*See id.* at 28:11-29:6.) It is possible that he meant that the concept of the final IPSAP product, and not the product itself, had existed at the time of his departure. Furthermore, even assuming Mr. Whitehurst had indeed contradicted himself regarding the timing when TCI started building the IPSAP system, such does not substantially diminish the evidentiary value of the CTI Presentation.

[2] While acknowledging the similarity between this diagram and one of the figures in the '858 Patent, Mr. Henry, the other co-inventor, testified that he did not know who had created the diagram. (Trial Tr. Dec. 17, 2013 PM at 13:2-11 (Henry).)

Regardless of whether TCI started building the IPSAP system before or after Mr. Whitehurst's departure, it remains true that Mr. Whitehurst was listed as one of three presenters of the CTI Presentation, which itself was attached as a supporting document to the provisional application of the '858 Patent. Therefore, like the June 8, 2000 white paper – another supporting document to the provisional application – the Court finds that the CTI Presentation is competent evidence that a reasonable jury could have considered in determining Mr. Whitehurst's alleged inventorship.

Finally, Defendants presented circumstantial evidence to corroborate Mr. Whitehurst's alleged inventorship. Mr. Robert Freinberg – CEO of Cassidian – testified that in a prior lawsuit that Cassidian had filed against another company called Intrado for alleged infringement of the '858 Patent, Intrado made a similar contention that Mr. Whitehurst was a co-inventor of the '858 Patent. (Trial Tr. Dec. 16, 2013 AM at 123:12-22, 124:4-9, 126:6-9 (Freinberg).) Intrado further claimed that it had obtained Mr. Whitehurst's rights under the '858 Patent. (*Id.* at 127:4-6.) Intrado and Cassidian eventually entered into a licensing agreement, under which Intrado agreed to pay a lump sum of $12.5 million in exchange for a license to practice the '858 Patent, and Cassidian agreed to pay $10.0 million to Intrado for "all rights and obligations that Intrado may have gained or incurred" pursuant to a prior purchase agreement between Mr. Whitehurst and Intrado. (*Id.* at 127:18-21, 128:18-19, 129:5-11.) At trial, Defendants suggested to the jury that the ten million dollars that Cassidian had paid for whatever rights Intrado might have gained from Mr. Whitehurst reflect Cassidian's own belief that Mr. Whitehurst had at least some rights to the '858 Patent. (*See*, *e.g.*, Trial Tr. Dec. 16, 2013 AM at 59: 17-25.) Cassidian now contends that its payment under the Intrado license agreement cannot corroborate Mr. Whitehurst's testimony, because it is not evidence contemporaneous with the inventive process.

As noted above, contemporaneous evidence is not the only form of corroborating evidence. *See Linear Tech.*, 379 F.3d at 1327. The Court evaluates an alleged co-inventor's testimony under a "rule of reason analysis," which requires an "evaluation of all pertinent evidence." *Linear Tech.*, 379 F.3d at 1327. Here, that Cassidian, who denied any contribution from Mr. Whitehurst to the claimed invention, itself paid a considerable sum for rights to the '858 Patent that Intrado "may have" obtained from Mr. Whitehurst, is pertinent circumstantial evidence to Mr. Whitehurst's alleged inventorship. A reasonable jury is entitled to taking such into consideration in judging Mr. Whitehurst's credibility.

In summary, the Court disagrees with Cassidian that Defendants have failed to provide sufficient evidence to corroborate Mr. Whitehurst's testimony. Aside from Mr. Whitehurst's own testimony, Defendants have shown the jury that Mr. Whitehurst was the sole author of a white paper which was attached as supporting document to the provisional application of the '858 Patent. Mr. Whitehurst was listed as one of three presenters of a technical presentation – another supporting document to the '858 provisional application – which included a diagram resembling one of the figures in the '858 Patent. Mr. Whitehurst's testimony that he had created the diagram was un-contradicted. Finally, the jury heard evidence that Cassidian itself paid a considerable sum in exchange for rights to the '858 Patent that another entity allegedly had obtained from Mr. Whitehurst. Viewing all the pertinent evidence collectively, the Court finds that substantial evidence exists based on which a reasonable jury could have found that Mr. Whitehurst's testimony was sufficiently corroborated.

Cassidian next contends that Mr. Whitehurst had no idea whether the '858 Patent's claims relate to his alleged conception. Cassidian bases its argument on Mr. Whitehurst's testimony that

he did not know whether the claims of the ’858 Patent describe the ideas he had allegedly come up with. (*See* Trial. Tr. Dec. 19, 2013 AM at 37:8-38:5 (Whitehurst).) Mr. Whitehurst, however, also testified that he was not familiar with the concept of patent claims because he was not an attorney, and that he did read through the “technical portion” of the ’858 Patent. (*Id.* at 36:9-21.) Mr. Whitehurst then found that the ’858 Patent presented a VoIP-based PSAP system – the very idea that he allegedly had come up with. (*Id.* at 39:2-11.) A reasonable jury could have found that, despite Mr. Whitehurst’s unfamiliarity with formal patent claims, his understanding of the “technical portion” of the ’858 Patent enabled him to decide whether the subject matter of the patent related to his alleged conception.

Cassidian last argues that Mr. Whitehurst’s testimony should be discredited because it contradicts that of Mr. Henry, Mr. Craig Dollar, and Mr. Robert Freinberg. All three of them testified that Mr. Whitehurst made no contribution to the claimed invention. Despite such contradiction, however, judgment as a matter of law in Cassidian’s favor is inappropriate here. The jury heard testimony from Mr. Whitehurst, as well as from Mr. Henry, Mr. Dollar and Mr. Freinberg. A reasonable jury could have weighed Mr. Whitehurst’s testimony and corroborating evidence against the testimony from Mr. Henry, Mr. Dollar and Mr. Freinberg, and decided that it believed and was persuaded by Mr. Whitehurst’s story. Under such circumstance, it is wholly improper for the Court to replace the jury’s finding with Cassidian’s own assessment of Mr. Whitehurst’s credibility. *See E.E.O.C*, 731 F.3d at 451. Such would squarely circumvent our jury system.

To recap, substantial evidence exists in the record based on which a reasonable jury could have found, under the clear and convincing evidence standard, that Mr. Whitehurst was a

co-inventor of the ’858 Patent, and that his contribution was omitted from the final issued patent. Accordingly, the Court **DENIES** Cassidian’s motion for judgment as a matter of law that Defendants have failed to prove improper inventorship of the ’858 Patent. The Court additionally finds that a verdict of improper inventorship is not against “the great weight of the evidence,” and accordingly **DENIES** Cassidian’s motion for a new trial on this basis.[3] *See Smith*, 773 F.2d at 613.

**b. Anticipation**

At trial, the jury was asked to decide whether independent claims 1 and 3 of the ’858 Patent had been anticipated by three separate references proffered by Defendants: (1) U.S. Patent No. 6,697,858 (“Ezerzer”), filed on August 14, 2000; (2) U.S. Patent No. 6,587,545 (“Antonucci”), filed on October 23, 2000 and claiming priority to a provisional application filed on March 4, 2000; and (3) a publication titled “Telecommunications Security Guidelines for Telecommunications Management Network” (the “TSG reference”). (*See* DX0013, DX0014, DX 0018.)

*i. Ezerzer and Antonucci as prior art*

Cassidian contends that there exists no legally sufficient evidence upon which a reasonable jury could have found that Ezerzer and Antonucci qualify as prior art. This is because, although the ’858 Patent application was provisionally filed on January 26, 2001, its date of invention was in 1999, before the priority dates of both Ezerzer and Antonucci.[4] At trial, the jury was

---

[3] “If a patentee demonstrates that inventorship can be corrected as provided for in section 256, a district court must order correction of the patent, thus saving it from being rendered invalid.” *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1350 (Fed. Cir. 1998). In this case, however, Plaintiff Cassidian has never raised the issue of correcting inventorship under Section 256.

[4] It is undisputed that the priority dates for Antonucci and Ezerzer are March 4, 2000 and August 14, 2000 respectively.

specifically instructed on the law regarding the determination of the "date of invention" of the '858 Patent. (Trial Tr. Dec. 20, 2013 AM at 46:14-48:9.) Initially, this Court must resolve whether a reasonable jury could only have concluded that the '858 Patent is entitled to a date of invention in 1999.

"Priority of invention goes to the first party to reduce an invention to practice unless the other party can show that it was the first to conceive the invention and that it exercised reasonable diligence in later reducing the invention to practice." *Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1322 (Fed. Cir. 2013) (citation omitted). Conception is the "formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed. Cir. 1986). The idea must be "so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation." *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1577 (Fed. Cir. 1996). An inventor's own testimony regarding the date he had the complete idea must be corroborated. *Singh v. Brake*, 222 F.3d 1362, 1367 (Fed. Cir. 2000). In assessing corroboration of oral testimony, courts apply a rule of reason analysis, under which "[a]n evaluation of all pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached." *Id.* Reduction to practice follows conception. Actual reduction to practice requires that the claimed invention work for its intended purpose, while constructive reduction to practice occurs when a patent application on the claimed invention is filed. *Hybritech*, 802 F.2d at 1376. Finally, the evidence must show that the alleged earlier inventor was diligent "from a date just prior to the other party's conception to … [the date of] reduction to practice" by the

alleged earlier inventor. *See Mahurkar*, 79 F.3d at 1578.

At the jury trial, Mr. Henry, one of the co-inventors of the ’858 Patent, testified that he conceived the idea of the claimed invention in 1999. (Trial Tr. Dec. 17, 2013 AM at 65:7-10 (Henry); Trial Tr. Dec. 17, 2013 PM at 3:24-4:9 (Henry).) Mr. Henry was asked to identify a design document, created and last modified both in July 1999, which, according to him, represented the implementation of one embodiment of the ’858 Patent. (Trial Tr. Dec. 17, 2013 AM at 67:19-68:9, 72:4-18, 75:15-23 (Henry); PX0323; PX0303.) He was also asked to identify a second design document, dated March 31, 2000, which was a “later version” of the July 1999 document with enhancements. (*Id.*) Mr. Henry was further asked to identify a third design document, titled “NT Server Design Requirements” and dated December 8, 1999. (Trial Tr. Dec. 17, 2013 AM at 74:25-75:5 (Henry); PX0305.) Mr. Henry explained that the “NT Sever” was an operating name for the invention that eventually became the ’858 Patent. (*Id.*) A fourth design document titled “Call Manager,” created on July 1, 1999 and last modified on March 31, 2000, was also presented to the jury. (Trial Tr. Dec. 17, 2013 AM at 76:2-12 (Henry); PX0304.) In addition, Mr. Henry identified a design diagram dated October 9, 1999,[5] which was attached as a supporting document to the provisional application of the ’858 Patent. (Trial Tr. Dec. 17, 2013 AM at 77:7-16 (Henry); PX003 at CSDN_A-00000967.) According to Mr. Henry, this design diagram described the way active calls were tracked within TCI’s software system, and was on its fifth revision in October 1999. (*Id.*)

During Mr. Henry’s cross-examination, Defendants challenged the relevancy of the four design documents by pointing out that none of them had been included in the provisional patent

[5] The design diagram has a revision date of August 9, 1999 on its face. (*See* PX003 at CSDN_A-00000967.)

application.[6] (*See* Trial Tr. Dec. 17, 2013 AM at 86:4-87:6, 88:14-15, 89:15-90:12, 91:4-18, 92:4-9 (Henry); PX0303; PX0304; PX0305; PX0323.) Defendants further pointed out that the earliest entry in Mr. Henry's engineering notebook was on June 19, 2000, and that the notebook lacked any specific detail regarding the claimed technology. (Trial Tr. Dec. 17, 2013 PM at 15:4-20:1 (Henry); PX0390.) However, Defendants did not dispute Mr. Henry's testimony that one of the design documents, created and last modified both in July 1999, represented the implementation of one embodiment of the '858 Patent. (*See* PX0323.) Nor did Defendant dispute that another design document, titled "NT Server Design Requirements" and dated December 8, 1999, included detailed design requirements for "NT Server" – an operating name for the invention that eventually became the '858 Patent. (*See* PX0305.) Finally, Defendant did not challenge Mr. Henry's testimony that the October 9, 1999 design diagram, which was attached to the provisional application of the '858 Patent, described the way active calls were routed within TCI's software system – the precise subject matter of the '858 Patent. (*See* PX003 at CSDN_A-00000967.)

The Court finds that Mr. Henry's testimony regarding the 1999 conception date of the '858 Patent has been sufficiently corroborated by at least the two design documents last modified in July 1999 and December 1999 respectively, and by the October 1999 design diagram. (*See* PX0323, PX0305, PX003 at CSDN_A-00000967.) Defendants correctly noted that the two 1999 design documents had not been included in the provisional application. However, Mr. Henry's testimony regarding the subject of the two documents were not contradicted at trial, which established that one document was an implementation of one embodiment of the '858 Patent, and the other set forth detailed design requirements for a server system that eventually became the '858

[6] Defendants also questioned the authorship of these documents for purposes of proving inventorship.

Patent. In addition, the October 9, 1999 design diagram, submitted as a supporting document to the provisional application of the ’858 Patent, described the active call flow among various components of TCI’s software system on which the ’858 Patent was based. Mr. Henry’s testimony that this was the fifth revision of the design was likewise un-contradicted at trial. This design diagram, combined with the two 1999 design documents, substantially demonstrated that the idea of the ’858 Patent had been “complete and operative” in 1999, and all that remained was for the inventors to continue revising the design to its perfection. *See Hybritech*, 802 F.2d at 1376. Indeed, Mr. Henry’s testimony is consistent with that of Defendant’s own witness Mr. Whitehurst, who also testified that the ’858 Patent was conceived either in 1999 or early 2000, well before the filing date of the provisional application. (Trial Tr. Dec. 19, 2013 AM at 14:16-20 (Whitehurst).) Despite Defendant’s complaint that Mr. Henry’s engineering notebook lacked specificity, the notebook is not the only evidence proffered by Plaintiff. Therefore, under the “rule of reason” analysis, the evidence presented at trial substantially supported Mr. Henry’s alleged conception date in 1999, and Defendants have failed to demonstrate otherwise. *See Singh*, 222 F.3d at 1367. The Court finds that the only reasonable conclusion regarding the conception date of the ’858 Patent was that it had been conceived in 1999.

Furthermore, Mr. Henry testified that between June 1998 until January 2001 when the provisional application of the ’858 Patent was filed, he and his team at TCI continued developing the claimed invention diligently. (Trial Tr. Dec. 17, 2013 AM at 76:23-77:6 (Henry).) Mr. Henry’s testimony was corroborated by the different versions of design documents which had been created in July 1999 and modified in March, 2000, and the group of design diagrams attached to the provisional application of the ’858 Patent dated between July 8, 1999 and October 23, 2000.

(*See* PX0323; PX0303; PX003 at CSDN_A-00000879-924.) Defendant provided no contradicting evidence or testimony regarding Mr. Henry's alleged efforts to continuously develop the claimed invention since conception. Defendants merely pointed out that two other TCI engineers then working with Mr. Henry could have corroborated Mr. Henry's story. (*See* Trial Tr. Dec. 17, 2013 PM at 5:12-6:13 (Henry).) However, testimony from co-workers is not the only form of corroborating evidence. Mr. Henry's testimony on diligence in reduction to practice was corroborated by contemporaneous documentary evidence, and Defendants have failed to show otherwise. Therefore, a reasonable jury could only have concluded that, the inventors of the '858 Patent had been diligent in reducing the invention to practice, from a date before the priority dates of Antonucci and Ezerzer, till the date the '858 provisional application was filed. *See Mahurkar*, 79 F.3d at 1578.

In summary, viewing all the pertinent evidence in the record, the Court is persuaded that a reasonable jury could only have concluded: (1) the '858 Patent had been conceived in 1999; and (2) the inventors of the '858 Patent had worked diligently in reducing the invention to practice. Therefore, a reasonable jury could only have found that the '858 Patent is entitled to a date of invention in 1999, predating both Ezerzer and Antonucci. Accordingly, neither Ezerzer nor Antonucci qualifies as prior art to the '858 Patent. *See Taurus*, 726 F.3d at 1323 (holding that a patent is removed as a prior art reference, when an alleged earlier inventor demonstrates conception before the filing date of the reference patent and diligent reduction to practice after that date). The Court **GRANTS** Cassidian's motion for judgment as a matter of law that Defendants have failed to prove by clear and convincing evidence that claims 1 and 3 of the '858 Patent are

anticipated by Ezerzer or Antonucci.[7]

*ii. Anticipation by the TSG reference*

Cassidian next argues that Defendants have failed to prove that the TSG reference anticipates claims 1 and 3 of the '858 Patent. The parties do not dispute that TSG, dated October 1995, qualifies as prior art to the '858 Patent. As such, the Court focuses on whether substantial evidence supports a finding that, under the "clear and convincing evidence" standard, the TSG reference discloses each and every element of claims 1 and 3 of the '858 Patent. *See Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1374 (Fed. Cir. 2001).

Claim 1 of the '858 Patent recites:

1. An emergency services communication system, comprising:

> a **plurality of remote terminals** for enabling emergency services operators to receive incoming calls and to dispatch emergency service personnel in response to said incoming calls said terminals each associated with one of a plurality of call centers;
>
> a **wide area network** interfaced with each of the plurality of remote terminals;
>
> a **central data manager** configured to receive said incoming calls and to route said incoming calls to said plurality of remote terminals over said wide area

[7] At trial, the jury was not specifically instructed under 35 U.S.C. 102(e), i.e., that "an invention is not new if it was described in a published patent application filed by another in the United States" before the date of invention. Neither party objected to this omission at trial. Cassidian now argues that, because of such, the critical dates for Ezerzer and Antonucci should be the dates Ezerzer and Antonucci became "publically known or described in a printed publication," which are later than their respective filing dates. (*See* Dkt. No. 184 at 19-20.) Defendants, on the other hand, urge this Court to use Ezerzer and Antonucci's filing dates as the critical dates. The Court finds it unnecessary to resolve such dispute. As discussed above, the Court finds that a reasonable jury could only conclude that the '858 Patent is entitled to a date of invention in 1999, predating the earliest filing dates of both Ezerzer and Antonucci. Therefore, Ezerzer and Antonucci do not qualify as prior art under either Plaintiff or Defendants' theory.

network, said central data manager comprising a server having **a database that is partitioned** such that a first partitioned portion contains first data associated with a particular one of said call centers, so as to maintain privacy of the first data, the partitioned database being configured to serve the plurality of call centers;

wherein each of said incoming calls is associated with **Automated Number Information** and **Automatic Location Information** data identifying a communication device from which said incoming call originated and wherein each of said incoming calls is delivered over said Wide Area Network to a particular one of said remote terminals by said central data manager based on said associated Automatic Number Information of said incoming call and wherein said central data manager is located in a centralized secure facility with on-site server capability for analyzing and recording said Automatic Number information and said Automatic Location Information for each of said incoming calls; and

wherein said centralized secure facility serves a plurality of Public Safety Answering Points, each of which comprise multiple individual members of said plurality of remote terminals.

('898 Patent *Ex Parte* Reexamination Certificate, 1:25-60 (emphasis added).)

At trial, Defendants' expert Dr. Konchitsky opined that the TSG reference anticipated claim 1 of the '858 Patent. (Trial Tr. Dec. 19, 2013 AM at 127:3-5 (Konchitsky).) The following consists of Dr. Konchitsky's entire testimony regarding the first two elements of claim 1, i.e., "an emergency services communication system" and "a plurality of remote terminals":

Q. (By Mr. Edward Pennington) Does TSG describe an emergency services

communication system?

A. Yes.

Q. Does it describe a system that includes a plurality of remote terminals?

A. Yes.

(*Id.* at 127:10-15.)

Dr. Konchitsky's testimony regarding whether TSG discloses the first two elements of claim 1 is entirely conclusory, lacking any of the specificity required by the "clear and convincing evidence" standard. Therefore, the Court finds that no reasonable jury, based on these naked conclusions, could have found that TSG discloses the first two elements of claim 1.

With respect to the claim element "a wide area network interfaced with each of the plurality of remote terminals," Dr. Konchitsky testified that the following text on page 10 of the TSG reference discloses a "wide area network":

> The PSN is becoming increasingly controlled and dependent on software and operations networks that may offer customer *access to network functions*, user-configured database, and special features.

(*Id.*at 7-15; DX0018 at 10 (emphasis added).)

Dr. Konchitsky failed to explain why a generic description of "network functions" constitutes a disclosure of a specific type of network, i.e., "wide area network" as recited in claim 1. Dr. Konchitsky also failed to identify how the paragraph above discloses a wide area network that is "interfaced with each of the plurality of remote terminals," as required by claim 1. Therefore, the Court finds that no reasonable jury could have found that TSG discloses a "wide area network interfaced with each of the plurality of remote terminals" based on Dr. Konchitsky's testimony.

Dr. Konchitsky's testimony regarding the remaining elements of claim 1 is similarly imprecise and conclusory. For example, with respect to the requirement that "each of said incoming calls is associated with Automated Number Information and Automatic Location Information data," Dr. Konchitsky testified that he could not remember where in the TSG reference this claim element was disclosed. (*Id.* at 129:21-130:2.) Nonetheless, he opined that this limitation was found in the TSG reference, because he "did remember" that he had an opinion of such. (*Id.* at 130:3-7.)

The Court need not list exhaustively Dr. Konchitsky's testimony regarding the TSG reference. It suffices to say that, as noted in the examples above, such testimony is mostly vague, conclusory and lacks specificity. (*See id.* at 126:15-131:7.) The Court is persuaded that no reasonable jury could have found that the TSG reference disclosed each and every element of claim 1 based on Dr. Konchitsky's testimony. *See Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 294 (Fed.Cir.1985) ("Lack of factual support for expert opinion going to factual determinations, however, may render the testimony of little probative value in a validity determination."). Given that such testimony is the only basis supporting Defendants' argument that TSG anticipates claim 1 of the '858 Patent, no reasonable jury could have sided with Defendants on this issue. Accordingly, the Court **GRANTS** Cassidian's motion for judgment as a matter of law that Defendants have failed to prove by clear and convincing evidence that the TSG reference anticipates claim 1 of the '858 Patent.

As to claim 3 of the '858 Patent, Dr. Konchitsky did not provide an element-by-element analysis, and instead testified as follows:

Q. (By Mr. Edward Pennington) Do you have an opinion as to whether or not TSG

would invalidate Claim 3?

A. Yes, it did.

Q. And would it be for the same disclosures that were referred to with respect to Claim 1?

A. Yes.

(*Id.* at 131:13-19.)

Therefore, Dr. Konchitsky's opinion as to whether TSG anticipates claim 3 is based on "the same disclosures that were referred to with respect to Claim 1." Having decided that no reasonable jury could have found that TSG disclosed each and every element of claim 1, the Court necessarily finds the same with claim 3. Accordingly, the Court additionally **GRANTS** Cassidian's motion for judgment as a matter of law that Defendants have failed to prove by clear and convincing evidence that the TSG reference anticipates claim 3 of the '858 Patent.

**c. Written Description and Enablement**

Cassidian next argues that Defendants have failed to present evidence sufficient for a reasonable jury to find the '858 Patent invalid because of lack of written description or enablement. At trial, the jury was instructed to determine whether Defendants had proved by clear and convincing evidence that each asserted claim of the '858 Patent was invalid for lack of written description or for failing the enablement requirement. (Trial Tr. Dec. 20, 2013 AM at 48:21-52:15.)

A patent specification must contain an adequate written description. 35 U.S.C. § 112; *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1319 (Fed. Cir. 2003). "The test for compliance with § 112 has always required sufficient information in the original disclosure to

show that the inventor possessed the invention at the time of the original filing." *Moba*, 325 F.3d at 1320. "The possession test requires assessment from the viewpoint of one of skill in the art." *Id.*

In addition, to satisfy Section 112, the patent specification must "enable a person of ordinary skill in the art to make and use the invention." 35 U.S.C. § 112; *Cephalon, Inc. v. Watson Pharm., Inc.*, 707 F.3d 1330, 1336 (Fed. Cir. 2013). This requirement is met when at the time of filing the patent application, one skilled in the art, having read the specification, could practice the invention without "undue experimentation." *Cephalon*, 707 F.3d at 1336. The following factors may be considered when determining if a disclosure requires undue experimentation: (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims. *Id.* "These factors while illustrative are not mandatory." *Id.* Although experimentation must not be undue, "a reasonable amount of routine experimentation required to practice a claimed invention does not violate the enablement requirement." *Id.* Finally, a patent is presumed enabled. *Id.* at 1337. The burden to prove lack of enablement by clear and convincing evidence is Defendants' alone. *Id.*

At trial, Defendants' expert Dr. Konchitsky testified that the '858 Patent did not include sufficient description for a "partitioned database" – an element required by all asserted claims. Dr. Konchitsky further testified that the patent specification did not teach one of ordinary skill in the art how to make a "partitioned database." Below is the entire testimony from Dr. Konchitsky regarding both written description and enablement:

Q. Did the patent describe how to make a partitioned database?

A. No.

Q. So a lot of the testimony that we've heard in Court about extremely minute detail about how databases are built, none of that was in the patent, was it?

A. That's correct, it was not in the patent.

Q. And the only description found in the patent was just a couple of words that said the words "partitioned database," right?

A. Yes. I can point in the patent where it is, that's correct.

MR. EDWARD PENNINGTON: Could you pull up the patent, please? I believe it's PX 1. And it's --

THE WITNESS: If you go further into the – I think the third page of the patent, yeah.

A. So that's the place that discussed a partition. It's on Page 6.

Q. (By Mr. Edward Pennington) Is that the full extent of the description of how databases might be partitioned?

A. Yes.

Q. And you've written software for partitioned databases or at least SQL databases, or any kind of databases, right?

A. Yes.

Q. Okay. And would this be able to teach one of ordinary skill in the art how to make a specific kind of database?

A. No.

(Trial Tr. Dec. 19, 2013 AM at 51:19-52:23 (Konchitsky).)

Dr. Konchitsky's testimony consists of a series of "yes" and "no" answers to counsel's leading questions, without providing any specific reason for giving such answers. While Dr. Konchitsky did identify a page from the '858 Patent specification upon which he purportedly formed his opinion, he never explained how such evidence demonstrated that, to build a partitioned database, one skilled in the art would have to go through "undue experimentation." *See Cephalon*, 707 F.3d at 1336. Dr. Konchitsky's *ipse dixit* statements that the '858 Patent failed the written description and enablement requirements cannot be sufficient to constitute clear and convincing evidence. *See id.* at 1338. Given that Dr. Konchitsky's testimony is the only basis upon which Defendants attempted to invalidate the '858 Patent under Section 112, the Court finds that no reasonable jury could have concluded that the '858 Patent was invalid for lack of written description or for failing the enablement requirement.[8] Accordingly, the Court **GRANTS** Cassidian's motion for judgment as a matter of law that Defendants have failed to prove by clear and convincing evidence that the '858 Patent was invalid under Section 112.

In summary, the Court has denied Cassidian's motion for judgment as a matter of law that Defendants failed to prove improper inventorship, and also denied its motion for a new trial on this basis. The Court has granted Cassidian's motion for judgment as a matter of law with respect to all other grounds of invalidity. Given that a finding of improper inventorship alone would have been sufficient to invalidate all asserted claims of the '858 Patent, the jury's invalidity verdict must stand. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831 (Fed. Cir. 2010) (holding that an appellate court would uphold a general verdict "if there was sufficient evidence to support *any* of

[8] In opposition to Cassidian's motion for judgment as a matter of law under Section 112, Defendants cited to portions of the reexamination history of the '858 Patent. (*See* Dkt. No. 195 at 37 n.133.) Such evidence, however, has never been presented to the jury at trial, and must be disregarded by the Court in this analysis.

the [party's] alternative factual theories.").

**B. The Jury's Finding of Non-infringement**

The jury found that microDATA had not directly infringed claims 1, 6-8 of the '858 Patent and had not indirectly infringed claims 1, 3-8 and 12-14. (*See* Dkt. No. 155 at 1-2.) The jury also found that TCS had not indirectly infringed claims 3-5, 12-14 of the '858 Patent. (*See id.* at 2.) Cassidian now argues that the jury's non-infringement verdict contradicts the "great weight of the evidence," and thus a new trial should be granted. *See Smith*, 773 F.2d at 613.

Cassidian's attack on the jury's non-infringement verdict focuses on three disputed claim limitations: (1) a "partitioned database," as required by all asserted claims of the '858 Patent ; (2) "each of said incoming calls is associated with Automated Number Information and Automatic Location Information data," as required by claim 1; and (3) a "wide area network" as required by claim 1. The Court will address each of these disputed elements in turn.

**a. Partitioned Database**

Both independent claims 1 and 3 require "a database that is partitioned" or a "partitioned database." (*See* '858 Patent, *Ex Parte* Reexamination Certificate, 1:39; 2:34.) The Court previously construed this claim term in *Plant Equip., Inc. v. Intrado, Inc.*, Civil Action No. 2:09-cv-0395-JRG (April 27, 2012). The parties have agreed to adopt the same construction in this case. The Court construed "partitioned database" as follows:

> an organization of call center data in computer data storage together with database management software running on the server, wherein the call center data is organized and made accessible such that the data of an individual call center is accessed without accessing the data of any other call center sharing the server.
>
> (Memorandum Opinion and Order at 13, Plant Equip., Inc. v. Intrado, Inc., No. 2:09-cv-0395-JRG (E.D. Tex. Apr. 27, 2012), ECF No. 127.)

*i. microDATA's databases*

Cassidian first argues that the great weight of the evidence confirms that Defendant microDATA's databases are partitioned.

At trial, Cassidian's expert Dr. Williams testified that microDATA's databases were partitioned as defined in the Court's claim construction. Dr. Williams based his opinion on a review of "documentation and [microDATA's] software, the testimony of the engineer from microDATA," as well as a design schema which showed how databases were organized in microDATA's X-Solution products. (Trial Tr. Dec. 16, 2013 PM at 72:17-73:6 (Williams); PX0350.) Dr. Williams explained that microDATA's databases are organized into tables, and the relationship between those tables is determined by "primary keys." (*Id.* at 73:7-16.) According to Dr. Williams, a primary key is the link to a certain set of data within the database, each primary key permitting its user to access only the corresponding set of data while restricting the user's access to other data within the database. (*Id.* at 74:4-5; 75:22-25.) Each Public Safety Answering Point ("PSAP") call center which uses microDATA's software is associated with a globally unique identifier ("GUID"). (*Id.* at 73:17-25.) Dr. Williams explained that the PSAP GUID is a type of primary key, which allows a particular PSAP to access its own data within microDATA's databases while restricting its access to data of other PSAPs. (*Id.* at 73:19-25; 75:16-18; 122:15-25; 124:4-9.) Dr. Williams further testified that on some occasions a user may be given access to data of more than one PSAP. (*Id.* at 85:11-19.) This, however, "doesn't negate the ability of the database to isolate information from various users." (*Id.*)

Cassidian additionally provided testimony from Mr. Kevin Haynie, former employee of microDATA. Mr. Haynie started at microDATA between 2005 and 2006, and left in March

2011, about a year before Cassidian filed this case. (Trial Tr. Dec. 17, 2013 PM at 51:17-52:3 (Haynie).) At the time of his departure, Mr. Haynie was microDATA's Director of Development. (*Id.* at 52:4-8.) During his time at microDATA, Mr. Haynie wrote software for xSwitch – one of microDATA's X-Solution products – and for libraries of microDATA's databases. (*Id.* at 63:1-8; *id.* at 41:1-6 (Heinrich).) Mr. Haynie testified that microDATA's system uses "SQL authentication" to ensure that an authorized user may only access their own information within the database. (*Id.* at 60:6-61:5 (Haynie).) Mr. Haynie further testified that an administrator of microDATA's system may control different PSAPs to access different sets of information, though this is done at the "application level," and not through SQL authentication. (*Id.* at 61:22-62:6.)

Defendants' expert Dr. Konchitsky and Defendant TCS's witness Mr. Victor Burton both agreed that a primary key can be used to restrict access to only a certain set of data within a database. (Trial Tr. Dec. 19, 2013 AM at 81:15-18 (Konchitsky); Trial Tr. Dec. 18, 2013 PM at 57:11-15 (Burton).) Dr. Konchitsky, however, testified that such a setting is undesirable in the PSAP context, because PSAPs needed to be able to share data among one another in emergency situations. (Trial Tr. Dec. 19, 2013 AM at 48:17-24; 50:11-24; 81:19-21 (Konchitsky).) Dr. Konchitsky further testified that microDATA has implemented its software system such that all PSAPs are allowed to share a single database. (*Id.* at 48:17-18.) He based his opinion on a microDATA document about its X-Solution products, which stated that a "common challenge faced by today's PSAPs" was to share call information seamlessly among various PSAPs. (*Id.* at 77:3-22; PX0332 at MDINC0003527.) According to Dr. Konchitsky, allowing various PSAPs to share call information such as a caller's name, phone number and address is a standard industry

practice.[9] (Trial Tr. Dec. 19, 2013 AM at 77:23-78:7 (Konchitsky).) Further, Mr. Bruce Jason Heinrich, Present of microDATA, testified that within microDATA's system, there is "no way" that one particular PSAP is granted access only to a portion of the data because microDATA keeps "all of the data in one place for all of the PSAPs." (Trial Tr. Dec. 18, 2013 AM at 101:7-102:2 (Heinrich).) Mr. Heinrich explained that microDATA did so to make all the data available to all the PSAPs for purposes of sharing information among various PSAPs, and to "move agents from PSAP to PSAP to log in and see that data." (*Id.* at 102:2-5.)

To recap the pertinent evidence, both sides agree that a primary key, such as the PSAP GUID in microDATA's system, can be used to restrict access to only a certain set of data within the database. The parties diverge, however, as to whether microDATA's software system implements the PSAP GUID such that "the data of an individual call center is accessed without accessing the data of any other call center sharing the server." Plaintiff's expert Dr. Williams opined that the PSAP GUID allowed a particular PSAP to access data associated only with that PSAP, *and* restricted it from gaining access to data associated with other PSAPs. (Trial Tr. Dec. 16, 2013 PM at 73:17-25 (Williams).) Defendants' expert and witness, however, testified that no such restriction was placed on PSAPs, because in emergency situations all data needs to be made available to all PSAPs, to facilitate "mov[ing] agents from PSAP to PSAP." (Trial Tr. Dec. 19, 2013 AM at 48:17-18 (Konchitsky); Trial Tr. Dec. 18, 2013 AM at 102:2-5 (Heinrich).) Indeed, Dr. Williams did not deny that a user associated with one PSAP may have access to data associated

[9] Cassidian argues that caller ID, address and phone number are not "data of an individual call center" as stated in the Court's claim construction. Cassidian thus contends that various PSAPs' ability to share such information is irrelevant to the inquiry of whether or not microDATA's databases are partitioned. The Court disagrees. As an initial matter, Cassdian never distinguished between "data about callers" and "data about an individual call center" at trial. Further, the jury was presented with testimony that, in an Enhanced 9-1-1 system, geographically separated PSAPs each are associated with a particular database that includes a set of names, addresses and phone numbers. (Trial Tr. Dec. 19, 2013 AM at 60:9-15 (Konchitsky).) Such testimony demonstrated that "data about callers" is at least part of the "data about an individual call center."

with multiple PSAPs. (Trial Tr. Dec. 16, 2013 PM at 85:11-19 (Williams).) Weighing all the pertinent evidence, the Court finds that, while PSAP GUID *may* be used to restrict a particular PSAP's ability to access data associated with other PSAPs, a reasonable jury could have concluded that microDATA did not implement PSAP GUID to achieve this specific result. A jury could have reasonably found that microDATA used PSAP GUID as the "link" to a set of data associated with a particular PSAP, without restricting other PSAPs from accessing the same set of data. Based on the testimony of Dr. Konchitsky and Mr. Heinrich, the jury could have found that all PSAPs in microDATA's system share a single database, where each PSAP has access to all the data within the database, such data including at least caller IDs, phone numbers and addresses. Therefore, a reasonable jury could have found that, under the Court's claim construction, microDATA's databases are not "partitioned," and accordingly such a finding is not "against the great weight of the evidence."

*ii. TCS's databases*

Cassidian next argues that the great weight of the evidence confirms that Defendant TCS's databases are partitioned.

At trial, Cassidian's expert Dr. Williams testified that TCS's system contained the "same type of technique of isolating users and PSAP centers" as microDATA's system. (Trial Tr. Dec. 16, 2013 PM at 137:11-20 (Williams).) Dr. Williams explained that TCS's Gemini system – the accused infringing system – also used a primary key structure called "Responder" to identify a particular PSAP, which assigned a PSAP ID to each PSAP as the primary key. (*Id.* at 138:5-25, 139:2-140:7; PX0016 at TCS0007547; PX0014.) As with microDATA's system, Dr. Williams testified that TCS's Gemini system restricted access to data based on PSAP IDs. (Trial Tr. Dec.

16, 2013 PM at 140:10-12 (Williams).) According to Dr. Williams, the Gemini system used "responder numbers" to isolate information of one responder from another, with each "responder number" being linked to a particular set of "Internet addresses, URLs – about the initial call location, the alternative route location, and a transfer location for the call." (*Id.* at 141:8-142:12; PX0015.) Finally, Dr. Williams testified that TCS's system allowed a system administrator to create, delete and maintain user accounts, as well as to authenticate users and grant those users access to different web-based applications and reports. (*Id.* at 143:2-13; PX0345 at TCS0237156.) Authorized personnel would be able to view all data or only a subset of data depending on "that individual's role." (*Id.* at 143:14-24; PX0018 at TCS00616632.)

On the other hand, TCS's witness Mr. Burton testified that PSAPs in the Gemini system "are not allowed to access data in the Gemini database." (Trial Tr. Dec. 18, 2013 PM at 31:16-25 (Burton).) Instead, the PSAPS can only query for information relating to a call, such as the call location. (*Id.* at 31:20-4.) Mr. Burton further testified that information of all PSAPs is stored in Gemini's database, which is not configured to keep the data of one PSAP from that of another. (*Id.* at 33:15-17.) According to Mr. Burton, TCS used the primary key for the purpose of enhancing database retrieval time. (*Id.* at 54:13-24.)

Viewing all the pertinent evidence, the Court finds that Cassidian's allegation that TCS's databases are partitioned suffers the same flaw as that with microDATA's databases. Cassidian demonstrated that TCS's system employed a "primary key" to uniquely identify a PSAP, and that it is possible to use such primary key to restrict a particular PSAP from accessing data associated with other PSAPs. However, the evidence falls short of proving that TCS implemented the primary key to achieve this specific result. Indeed, Dr. Burton testified that the Gemini system

used the primary key to enhance database retrieval time, and not, as Cassidian alleges, to restrict a PSAP's ability to access data associated with another PSAP. (Trial Tr. Dec. 18, 2013 PM at 54:13-24 (Burton).) Such testimony was not contradicted at trial. Mr. Burton further testified that all PSAPs in the Gemini System share a single database, which is not configured to keep the data of one PSAP from that of another. (*Id.* at 33:15-17.) While Dr. Williams disagreed with Mr. Burton, the disagreement alone is insufficient to demonstrate that a finding consistent with Mr. Burton's testimony is "against the great weight of the evidence." Finally, Cassidian contends that TCS's user access control/authentication feature proves that its databases are "partitioned." (*See* Dkt. No. 184 at 47.) However, the testimony Cassidian solicited at trial failed to specify how such feature enables "the data of an individual call center to be accessed without accessing the data of any other call center sharing the server." (*See* Trial Tr. Dec. 18, 2013 PM at 64:17-24, 52:8-54:7 (Burton); Trial Tr. Dec. 17, 2013 PM at 74:25-75:7 (Burton).) Therefore, the Court finds that a reasonable jury could have concluded that TCS did not use the primary key to restrict a particular PSAP from accessing data associated with other PSAPs. A finding that TCS's databases are not "partitioned" is not "against the great weight of the evidence."

**b. ANI and ALI or Equivalents**

Claim 1 of the '858 Patent requires that, within the "emergency services communication system,"

> *each of said incoming calls* is associated with *Automated Number Information* and *Automatic Location Information* data identifying a communication device from which said incoming call originated and wherein each of said incoming calls is delivered over said Wide Area Network to a particular one of said remote terminals by said central data manager based on said associated *Automatic Number Information* of said incoming call and wherein said central data manager is located in a centralized secure facility with on-site server capability for analyzing and recording said *Automatic Number Information* and said *Automatic Location*

*Information* for each said incoming calls.

('898 Patent *Ex Parte* Reexamination Certificate, 1:44-56 (emphasis added).)

The Court previously adopted the parties' agreed claim construction for "Automatic/Automated Number Information" as "the telephone number of the telephone used by the calling party." (*See* Dkt. No. 71 at 6.) The Court further construed "Automatic Location Information" as "information about the calling party which includes the name, address and other information related to the location of the calling party (e.g., agencies that serve that address, such as police, fire department, and ambulance)." (*See id.* at 11.) The Court construed "each of" to be given its plain and ordinary meaning. (*See id.* at 12.)

It is undisputed that microDATA's accused system received three types of calls: wireline calls or calls delivered via landlines; wireless calls; and Voice-over-Internet Protocol ("VoIP") calls. (*See* Trial Tr. Dec. 16, 2013 PM at 49:16-50:6 (Williams).) Cassidian argues that microDATA infringed the above element of claim 1, because all three types of incoming calls are associated with Automatic/Automated Number Information ("ANI") or an equivalent thereof, and Automatic Location Information ("ALI") or an equivalent thereof. Defendant microDATA, on the other hand, avers that only wireline calls are associated with actual ANI and ALI, while wireless and VoIP calls are not associated with either ANI or ALI or the equivalents thereof. At trial, the jury was instructed on the law of literal infringement as well as infringement under the doctrine of equivalents. (Trial Tr. Dec. 20, 2013 AM at 30:23-34:8.)

Under the doctrine of equivalents, the infringement analysis should focus on "the role played by each element in the context of the specific patent claim," which informs the inquiry as to "whether a substitute element matches the function, way and result of the claimed element, or

whether the substitute element plays a role substantially different from the claimed element."
*Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997). Equivalency should be evaluated at the time of infringement, from the perspective of a person having ordinary skill in the art. *See id.* at 37.

Here, both sides agree that a wireline call is associated with ANI and ALI as recited in claim 1, which information is used to identify and route the wireline call to an appropriate PSAP. (*See* '898 Patent *Ex Parte* Reexamination Certificate, 1:44-56.) Cassidian's expert Dr. Williams testified at trial that, for a wireline call, ANI is the telephone number of a phone, e.g., in someone's house, which may be used to identify a specific caller; and ALI is the street address where the phone is located. (*See* Trial Tr. Dec. 16, 2013 PM at 50:19-24; 88:3-8 (Williams).) The parties also appeared to agree that neither wireless nor VoIP calls are literally associated with ANI or ALI. (*See id.* at 88:9-12; 90:14-91:2.) In essence, the parties' dispute focuses on whether or not wireless and VoIP calls are associated with the equivalents of ANI and ALI.

Dr. Williams testified that each wireless call is associated with an equivalent of ANI and ALI, which is "a particular number" called "Emergency Services Routing Key" ("ESRK"). (*See id.* at 88:9-89:10; Trial Tr. Dec. 17, 2013 AM at 58:2-4 (Williams).) Dr. Williams explained that ESRK is a number generated by the mobile carrier and relates – through the mobile carrier's database – to a particular cell phone and a particular transaction on that cell phone. (Trial Tr. Dec. 17, 2013 AM at 58:5-11 (Williams).) According to Dr. Williams, ESRK is used to determine the identity of the caller and to associate that incoming call with a particular device or terminal, much like ANI being used to identify a specific phone or caller. (*See* Trial Tr. Dec. 16, 2013 PM at 89:15-21 (Williams).) Dr. Williams further testified that ESRK also conveys location

information associated with a wireless call, information such as cell tower number or a GPS location in the form of longitudes and latitudes. (*Id.* at 898:14-22.) Dr. Williams opined that information about the identity and location of the caller, as conveyed by ESRK, is used by an emergency call system such as microDATA's accused system to route the wireless call to an appropriate PSAP. (*Id.* at 90:1-4.) Thus, ESRK achieves substantially the same "function, way and result" with wireless calls as ANI and ALI with wireline calls. (*Id.* at 90:5-8; Trial Tr. Dec. 17, 2013 AM at 57:24-58:4 (Williams).) As to VoIP calls, Dr. Williams testified that each VoIP call is also associated with a unique number called "Emergency Services Query Key" ("ESQK"), for purposes of identifying the caller and determining the location of the incoming call. (Trial Tr. Dec. 16, 2013 PM at 90:14-22 (Williams).) The accused system then uses the caller identity and location to route that VoIP call to the appropriate PSAP. (*Id.*) Dr. Williams thus opined that the use of ESQK with VoIP calls achieves substantially the same "function, way and result" as ANI and ALI with wireline calls. (*Id.* at 90:23-91:8.) Finally, Dr. Williams presented the result of his study of microDATA's source code, which uses a common set of logic and codes to route all three types of calls, regardless of whether a call is associated with ANI/ALI, ESRK or ESQK. (*Id.* at 91:14-92:11.)

Plaintiff's witness Mr. Kevin Haynie – former employee of microDATA – further testified that, to determine the location of an incoming call, microDATA's system performs a "lookup" into its database, based on different types of information for different types of calls. (*See* Trial Tr. Dec. 17, 2013 PM at 58:3-59:2 (Haynie).) ANI is used to look up the location associated with a wireline call. (*See id.* at 58:8-11.) A "pseudo-ANI" or "pANI," provided by the wireless carrier to uniquely identify a wireless caller, is used to obtain location information associated with the

wireless caller.  (*Id.* at 58:21-59:3.)  Finally, to look up location information of a VoIP call, Mr. Haynie testified that the accused system would have to rely on IP addresses.  (*Id.* at 58:11-12.)

Like Dr. Williams and Mr. Haynie, Defendant TCS's witness Mr. Burton also testified that the accused system uses ANI and ALI to identify and route wireline calls to the appropriate PSAP.[10]  (*See* Trial Tr. Dec. 18, 2013 PM at 25:5-26:7 (Burton).)  Mr. Burton also agreed with Dr. Williams that ESRK and ESQK may respectively be used to identify and route wireless and VoIP calls to the appropriate PSAP, in the same way ANI and ALI are used for purposes of identifying and routing wireline calls.  (*Id.* at 42:15-23; 43:20-44:13.)  Mr. Burton agreed with Mr. Haynie that a "pseudo-ANI" is used to obtain location information associated with a wireless caller,[11] and agreed with Dr. Williams that ESQK is used to obtain identity and location information associated with a VoIP caller.  (*Id.* at 26:10-27:1; 28:8-20.)  However, Mr. Burton denied that pseudo-ANI or ESQK has the same function as ANI, because, unlike ANI which is basically an existing telephone number, a pseudo-ANI or ESQK is not a dialable number.  (*Id.* at 27:6-13; 29:6-10.)  Nevertheless, Mr. Burton admitted that, after a wireless or VoIP caller places a call, there exists a call back number associated with that call for at least "some period of time," although the call back number is not pseudo-ANI or ESQK itself.  (*See id.* at 45:25-46:5.)  Defendant's expert Dr. Konchitsky's opinion regarding the ALI and ANI element of claim 1 is similar to that of Mr. Burton.  (*See* Trial Tr. Dec. 19, 2013 AM at 63:24-64:18 (Konchitsky).)

To sum up the pertinent evidence, both sides agree that ESRK (or pseudo-ANI) achieves substantially the same "function, way and result" for purposes of identifying and routing incoming

---

[10] The ANI and ALI requirements only appear in claim 1, which was not asserted against Defendant TCS.  (*See* Verdict Form, Dkt. No. 155 at 1-2.)

[11] Based on the testimony of Dr. Williams, Mr. Haynie and Mr. Burton, it is not entirely clear, though likely, that ESRK and pseudo-ANI, both associated with a specific wireless call, are in fact the same thing with different names.

wireless calls to the appropriate PSAP, as ANI and ALI with wireline calls. The parties further agree to the same as to ESQK in the context of identifying and routing VoIP calls. Defendants' primary basis for asserting that ESRK and ESQK are not the equivalents of ANI/ALI is that, unlike ANI, ESRK and ESQK are not themselves dialable call-back numbers. The Court, however, disagrees that such difference should be afforded substantial weight in the equivalency analysis. Neither the plain language of claim 1 nor the Court's claim construction requires that ANI, or the equivalents thereof, must function as a call-back number. Claim 1 makes it clear that ANI and ALI are used to (1) identify "a communication device from which [an] incoming call originated"; and (2) for the "central data manager" to route the incoming call to the appropriate PSAP. As noted above, both sides agree that ESRK and ESQK are equivalents to ANI and ALI for purposes of identifying and routing incoming calls to the appropriate PSAP. Indeed, the evidence shows that microDATA's system uses the same source code and logic to route all three types of incoming calls, regardless of whether the call is associated with ANI/ALI, ESRK or ESQK. (*See* Trial Tr. Dec. 16, 2013 PM at 91:14-92:11 (Williams).) That ESRK and ESQK are not themselves callback numbers does not disturb the finding that they achieve substantially the same "function, way and result" as ANI/ALI "in the context of [claim 1]."[12] *See Warner-Jenkinson*, 520 U.S. at 40. Therefore, the Court agrees with Cassidian that the great weight of the evidence confirms that microDATA's system infringes the ANI/ALI element of claim 1 as recited above.[13] Accordingly,

---

[12] Indeed, Defendant's witness Mr. Burton admitted that, though ESRK and ESQK are not themselves callback numbers, they are associated with a callback number through which the accused system may dial back to the original caller within a certain period of time. (*See* Trial Tr. Dec. 18, 2013 PM at 45:25-46:5 (Burton).)

[13] Though never presented to the jury, Defendants made the additional argument in their response brief that Plaintiff has failed to present testimony as to how ESRK and ESQK are equivalent to ANI/ALI for purposes of being "analyz[ed] and record[ed]" by the "on-site server" of the "centralized secure facility." (*See* '898 Patent Ex Parte Reexamination Certificate, 1:53-56.) The Court disagrees. As noted above, Dr. Williams testified that microDATA's system uses source code and logic that process the three different types of calls the same way. (*See* Trial Tr. Dec. 16, 2013 PM at 91:14-92:11 (Williams).) Dr. Williams further testified as to how ANI and ALI are

a finding to the contrary would be against "the great weight of the evidence."[14]

**c. Wide Area Network**

Cassidian further argues that the great weight of the evidence confirms that Defendant microDATA is liable for directly or indirectly infringing the "wide area network" element of claim 1. Claim 1 describes an "emergency services communication system, comprising…a *wide area network* interfaced with each of the plurality of remote terminals." ('898 Patent *Ex Parte* Reexamination Certificate, 1:33-34 (emphasis added).) Both sides agree that microDATA does not sell a wide area network ("WAN") to its customers. At trial, Cassidian presented two theories under which microDATA's system allegedly infringed the WAN element of claim 1. First, Cassidian alleged that microDATA "directs and controls" the provision of the WAN element. Second, Cassidian asserted that microDATA indirectly infringes claim 1 through active inducing or contributing to the direct infringement. The Court will address each of these two theories in turn.

*i. Direct infringement – direct and control*

At trial, the jury was instructed that claim 1 "may be directly infringed if one party has control over the practice of each and every element of the claimed invention so that the practice of all elements of the claimed invention is attributable to the controlling party." Trial Tr. Dec. 20,

analyzed and recorded in microDATA's system. (*See id.* at 103:21-104:8; 125:8-20.) Such testimony of Dr. Williams was un-contradicted at trial. Further, though testifying to TCS's rather than microDATA's accused system, Mr. Burton confirmed that the system follows "a similar flow" to analyze pseudo-ANI and ESQK as it does with ANI. (*See* Trial Tr. Dec. 18, 2013 PM at 26:10-28:16 (Burton).) Therefore, contrary to Defendants' argument, both sides have presented consistent evidence as to how ESRK (pseudo-ANI) and ESQK are equivalent to ANI/ALI for the "analyzing and recording" element of claim 1.

[14] Defendants have reiterated their pre-trial contention that the "each of" phrase in claim 1 requires *all* incoming calls to the accused system to be associated with ANI and ALI, or the equivalents thereof. (*See* Dkt. No. 148 at 13.) Plaintiff denies that such claim requirement exists. The Court, however, finds it unnecessary to resolve this dispute. Even assuming Defendants were correct, the great weight of the evidence confirms that all three types of calls to microDATA's system are associated with ANI and ALI, or the equivalents thereof. Defendants' purported claim requirement has been satisfied.

2013 AM at 34:14-18; *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1329 (Fed. Cir. 2008).

The jury was further instructed that "mere arms-length cooperation will not give rise to direct infringement by any party." Trial Tr. Dec. 20, 2013 AM at 35:2-5; *Muniauction*, 532 F.3d at 1329.

Cassidian's expert Dr. Williams testified that microDATA's X-Solution products use ESInet – a Wide Area Network – to deliver "particular call types to particular remote terminals." (Trial Tr. Dec. 16, 2013 PM at 62:3-15 (Williams).) Dr. Williams explained that the ESInet is "interfaced with" remote terminals as recited in claim 1, such that information carried by ESInet can flow to those remote terminals. (*Id.* at 62:15-19.) Dr. Williams further testified that, even assuming that ESInet were supplied by someone other than microDATA, he would not alter his opinion regarding microDATA's infringement, because microDATA "specifies how that Wide Area Network needs to operate," "causes that Wide Area Network to be connected to the remote terminals," and "tests and installs equipment that uses the Wide Area Network." (*Id.* at 62:20-63:4.) Dr. Williams based his opinions on three documents. One is a document from AT&T titled "AT&T ESInet to i3 PSAP CPE Interface Specification." (PX0031.) According to Dr. Williams, this document describes the specification for an interface between ESInet and AT&T's "customer premise equipment" ("CPE"), and it is microDATA who provided the actual specification regarding how the "ESInet would interface with the CPE." (Trial Tr. Dec. 16, 2013 PM at 63:16-64:8 (Williams).) Further, the jury was presented with an "Order between microDATA GIS, Inc. and AT&T Services, Inc," which described a set of work to be delivered by microDATA to AT&T. (*Id.* at 64:9-17.) Dr. Williams opined that mciroDATA participated in "actually specifying the details of the Wide Area Network and how it interfaces with its

equipment" within this Order. (*Id.* at 64:16-22.) Finally, Cassidian showed the jury an agreement between microDATA and Larimer County, Colorado for the "installation and maintenance of 9-1-1 telephone system." (PX0053.) Dr. Williams testified that Exhibit 1 to this agreement is a document drafted by microDATA describing the "technical specifications for what needs to occur" in order for this 9-1-1 system to be "installed and declared operational." (Trial Tr. Dec. 16, 2013 PM at 65:10-13 (Williams).) Specifically, Cassidian focused on the following excerpt in the agreement regarding the WAN connection:

> **WAN**
>
> The ECDCs at the Loveland Police Department and the Poudre Emergency Communications Center (Fort Collins) are engineered to be interconnected by a redundant *Metro Ethernet*, provided by Century Link, with a minimum of 20MB of bandwidth. LETA and/or CenturyLink will be responsible for the installation, ongoing maintenance, and all costs associated with the required Metro Ethernet, up to and including the media conversion equipment that is responsible for the Ethernet hand off to the routing environment. This shall be done in accordance with microDATA recommendations and specifications.
>
> (PX0053 at MDINC0001138-1139 (emphasis added).)

Cassidian additionally pointed to microDATA's witness Christine Heinrich's testimony about microDATA's business relationship with WAN providers, particularly AT&T. Ms. Heinrich testified to a contract between microDATA and AT&T for microDATA to provide certain software and services to AT&T. (Trial Tr. Dec. 17, 2013 PM at 89:23-90:10 (C. Heinrich).) Ms. Heinrich further testified that, according to a provision of the contract, microDATA were to provide support and trouble-shooting services in case any problem came up during the implementation of ESInet. (*Id.* at 92:19-93:12.) In discussing another contract, Ms. Heinrich testified that microDATA sold call handling services to certain customers, where the calls were handled with "microDATA technology in the ESInet, both delivered through AT&T."

(*Id.* at 97:18-24.) Additionally, Ms. Heinrich explained that microDATA's software system cannot run without certain building blocks, such as WAN, which are specified in microDATA's "statement of work." (*Id.* at 100:21-4.)

On the other hand, Defendant microDATA argued that it did not direct or control provision of the WAN element of claim 1. Dr. Konchitsky testified that microDATA neither sold WAN to its customer nor told its customer what kind of network the customer should implement. (Trial Tr. Dec. 19, 2013 AM at 69:8-25 (Konchitsky).) Further, Mr. Heinrich confirmed that microDATA's X-Solution software did not include a WAN. (Trial Tr. Dec. 18, 2013 AM at 106:21-23 (Heinrich).) Mr. Heinrich explained that implementing a WAN is the responsibility of microDATA's customers while microDATA itself only developed and sold software. (*Id.* at 106:24-107:8.)

Viewing all the pertinent evidence, the Court finds that, despite Dr. Konchitsky's testimony to the contrary, the documentary evidence substantially demonstrated that microDATA did specify to certain of its customers the kind of network upon which the customers should implement microDATA's software system. (*See, e.g.*, PX0053 at MDINC0001138 ("The ECDCs at the Loveland Police Department and the Poudre Emergency Communications Center (Fort Collins) are engineered to be interconnected by a redundant Metro Ethernet, provided by Century Link, with a minimum of 20MB of bandwidth.").) However, it is less clear whether such specification amounts to "direct and control" over its customers such that implementation of the WAN element should be attributable to microDATA. *See Muniauction*, 532 F.3d at 1329. The jury was instructed that "mere arms-length cooperation is insufficient to prove direct infringement." (Trial Tr. Dec. 20, 2013 AM at 35:2-5.) Almost all evidence Cassidian relied on

to prove "direct and control" comes from contracts between microDATA and a customer, under which microDATA was to deliver its X-Solution product to the customer and also to provide certain trouble-shooting and maintenance services. Meanwhile, Mr. Heinrich testified that, pursuant to the terms of the contract, the customer bore the responsibility to implement a WAN upon which microDATA's technology may operate. (*See* Trial Tr. Dec. 18, 2013 AM at 106:21-23 (Heinrich); PX0053 at MDINC0001138-1139 ("LETA and/or CenturyLink will be responsible for the installation, ongoing maintenance, and all costs associated with the required Metro Ethernet…").) Therefore, a reasonable jury could have found that a customer implemented a WAN per microDATA's specification simply as part of the "arms-length cooperation" between the two parties; and not, as Cassidian argues, did so under microDATA's control or direct. Accordingly, a finding that microDATA did not direct or control provision of the WAN element of claim 1 is not "against the great weight of the evidence."

*ii. Indirect infringement – contributory infringement*

Cassidian next argues that the great weight of the evidence demonstrates at least microDATA's liability for contributory infringement.[15] At trial, the jury was instructed as to the law governing contributory infringement. (Trial Tr. Dec. 20, 2013 AM at 38:18-39:25.) Contributory infringement prohibits sale and importation into the United States a component or apparatus for use in a patented process that has no use except through practice of the patented method. *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1374 (Fed. Cir. 2003). 35 U.S.C. §

[15] Though, in its opening brief, Cassidian also argues that the great weight of the evidence confirms microDATA's liability for active inducement, it has failed to provide proper evidentiary support for such argument. (*See* Dkt. No. 184 at 52-53.) For example, Cassidian has failed to point to any evidence in the record demonstrating that microDATA encouraged its customers to perform certain acts, *knowing that such acts would constitute infringement*. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011). The evidence Cassidian subsequently proffered focuses on its contributory infringement theory alone. (*See* Dkt. No. 199 at 30-31.)

271(c) sets forth the framework for proving contributory infringement:

> Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.
>
> 35 U.S.C. § 271(c).

At trial, the evidence showed that Defendants microDATA and TCS both knew about the ’858 Patent no later than the time they received Cassidian’s notification. (Trial Tr. Dec. 18, 2013 AM at 30:9-31:3 (Ginter); Trial Tr. Dec. 18, 2013 AM at 77:20-78:4 (Heinrich).) However, Mr. Heinrich testified that microDATA had not changed its products in response to the notice letter because they were advised by outside counsel that their products did not infringe the ’858 Patent. (Trial Tr. Dec. 18, 2013 AM at 78:5-15; 80:5-13 (Heinrich).) No other evidence was presented as to the intent requirement for contributory infringement.

As to the requirement that Defendants’ products had no “substantial noninfringing use,” neither side identified evidence bearing directly on this issue. Cassidian merely contends that Defendants have failed to assert any substantial non-infringing use for their products. (*See* Dkt. No. 199 at 30.) Defendants, on the other hand, cite to a portion of the Court’s jury instruction as “testimony” establishing “substantial noninfringing use.” (*See* Dkt. No. 200 at 35 n.121 (citing Trial Tr. Dec. 20, 2013 AM at 39:7-8).) Ultimately, however, Cassidian bears the burden to prove that Defendants’ products have no substantial noninfringing use, and, as noted above, it has failed to carry such burden. Therefore, the Court finds that, despite evidence establishing Defendants’ knowledge of the ’858 Patent, Cassidian has not met its clear burden to demonstrate that

Defendants' products have no substantial noninfringing use. A finding that Defendants did not contribute to the infringement of the '858 Patent is not "against the great weight of the evidence."

In summary, the Court finds that the great weight of the evidence confirms that microDATA did infringe the ALI/ANI element of claim 1. However, it is not "against the great weight of the evidence" for the jury to find that: (1) microDATA and TCS's databases are not "partitioned," as required by all asserted claims; and (2) microDATA did not directly or indirectly infringe the "wide area network" element of claim 1. Given that "[a]n accused device cannot infringe, as a matter of law, if even a single limitation is not satisfied," the jury's non-infringement verdict stands. *See Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1349 (Fed. Cir. 1998). Accordingly, the Court **DENIES** Cassidian's motion for a new trial on the issue of infringement.

## IV. CONCLUSION

For the reasons stated above, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** Cassidian's motion for judgment as a matter of law with respect to the jury's invalidity verdict, and **DENIES** Cassidian's motion for a new trial on the issue of validity or infringement. Notwithstanding the foregoing, the jury's verdict of non-infringement and invalidity stands, and is not altered by the above.

**So ORDERED and SIGNED this 8th day of August, 2014.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE